IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARYANN NAPOLI,                     :
                                    :
            Plaintiff               :    CIVIL No. 3:13-CV-01815
                                    :
        vs.                         :    Hon. John E. Jones III
                                    :
CAROLYN W. COLVIN, ACTING           :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
            Defendant               :

## MEMORANDUM

June 20, 2014

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Maryann Napoli's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Napoli met the insured status requirements of the Social Security Act through December 31, 2011. Tr. 10, 12 and 122.[1] In order to establish entitlement to disability insurance benefits

---

[1]References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of the Answer on September 24, 2013.

Napoli was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see <u>Matullo v. Bowen</u>, 926 F.2d 240, 244 (3d Cir. 1990).

Napoli protectively filed[2] her application for disability insurance benefits on August 24, 2010. Tr. 102-103, 108-109 and 122. The application was initially denied by the Bureau of Disability Determination[3] on December 17, 2010. Tr. 48-51. On December 22, 2010, Napoli requested a hearing before an administrative law judge. Tr. 52-54. After 10 months had passed, a hearing was held on October 24, 2011. Tr. 20-46. Prior to that hearing Napoli was sent at least three written notices outlining in detail her right to be represented by an attorney at the hearing. Tr. 55-77. Specifically on January 19, 2011, Napoli was advised, inter alia, as follows: "You may choose to be represented by a lawyer or other person. A representative can help you get evidence, prepare for the hearing, and present your case at the hearing." Tr. 55. Along with this notice Napoli was given a list

---

[2]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[3]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 48.

2

of groups that could help her find an attorney or representative. Tr. 59. Similar notices were mailed to Napoli on July 14 and September 6, 2011. Tr. 61 and 71. Napoli was not represented by an attorney or a representative at the hearing. <u>Id.</u>

Prior to taking evidence at the hearing, the administrative law judge again advised Napoli of her right to be represented by counsel and also specifically asked her if she received the notices advising her of that right. Tr. 24. Napoli acknowledged receiving the notices and stated that she would proceed with the hearing without counsel or a representative. <u>Id.</u> During the hearing the administrative law judge noted the lack of medical records supporting Napoli's claim and after the hearing took steps to obtain additional records.[4] Tr. 169-234.

On December 5, 2011, the administrative law judge issued a decision denying Napoli's application. Tr. 10-16. As will be explained in more detail *infra* the administrative law judge found that Napoli failed to prove that she met the requirements of a listed impairment or suffered from work-preclusive functional limitations through the date of the decision. <u>Id.</u>

On February 3, 2012, Napoli filed a request for review with the Appeals Council and after 11 months had elapsed the

---

[4]At the hearing there were only two exhibits in the medical portion of the Social Security file, Ehibits 1F and 2F. Tr. 27. After the hearing the administrative law judge obtained Exhibits 3F through 12F. Tr. 169-234.

3

Appeals Council on July 2, 2013, concluded that there was no basis upon which to grant Napoli's request for review.[5] Tr. 1-5.

Napoli then filed a complaint in this court on July 2, 2013. Supporting and opposing briefs were submitted and the appeal[6] became ripe for disposition on January 21, 2014, when Napoli filed a reply brief.

Napoli, who was born in the United States on January 24, 1963,[7] graduated from high school in 1981 and can read, write,

---

[5]After the ALJ issued her decision, Napoli submitted to the Appeals Council additional records which related to treatment Napoli received well-after her date last insured. Tr. 235-251. Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001). The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id. The Court of Appeals for the Third Circuit explained that to be material "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id. The items submitted to the Appeals Council related to a time after the ALJ issued her decision and well-after the date last insured and, consequently, are not material.

[6]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

[7]At the time of the administrative hearing held in this case Napoli was 48 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c). The Social Security regulations

speak and understand the English language and perform basic mathematical functions, including counting change, handling a savings account and using a checkbook and money orders. Tr. 124-125 and 144. During her elementary and secondary schooling, Napoli attended regular education classes. Tr. 126. After graduating from high school, Napoli successfully completed training at a beautician school. Id.

Napoli's work history covers 24 years and at least 20 different employers. Tr. 109-121. The records of the Social Security Administration reveal that Napoli had earnings in the years 1980 through 1986, 1989 through 1992, 1995 through 2003 and 2005 through 2008. Tr. 109. Napoli's annual earnings range from a low of $81.48 in 1990 to a high of $42,340.70 in 2007. Id. Napoli's total earnings during those 24 years were $258,251.79. Id.

A vocational expert described Napoli's past relevant employment history[8] as follows: (1) a newspaper district manager, skilled, medium work; (2) an automobile salesperson, skilled, light work; (3) a real estate agent, skilled, light work; and (4) a

_____

state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

[8]Past relevant employment in the present case means work performed by Napoli during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

mental health aide, skilled, medium work.[9]  Tr. 39.

_____

[9]The terms sedentary, light, medium, heavy and very work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

> (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

> (e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium,

6

Napoli claims that she is disabled because of "bulging disks," "nerve damage down [her] leg," and constant "severe headaches." Tr. 30; Doc. 10, Plaintiff's Brief, p. 3. Napoli contends that she "no longer has any strength in her back and suffers from constant pain" and that "she cannot sit or stand for a long period of time without experiencing severe pain." <u>Id.</u> Napoli did not claim that she was disabled because of a mental impairment. <u>Id.</u>

There are conflicting statements in the record from Napoli as to when she became disabled. Tr. 30, 102 and 125. In one document Napoli claims that she stopped working on May 31, 2009, "because of [her] conditions." Tr. 125.  In her application for disability benefits and at the administrative hearing she claimed that she became disabled in November, 2008. Tr. 30 and 102. Furthermore, the statements regarding the impetus for the disabling impairments conflict. Tr. 192, 197, 200, 211 and 218.  Some medical records refer to Napoli being injured while working at a nursing home[10] when she was lifting a wheelchair up a flight of stairs while other records state that she was injured while lifting a

---

light and sedentary work. 20 C.F.R. § 404.1567.

[10]As stated previously this work – as a mental health aide – was described by a vocational expert as skilled, medium work.

7

patient into a wheelchair.[11] <u>Id.</u> Napoli testified at the administrative hearing that the work-related incident occurred in November, 2008. Tr. 30. Medical records, however, repeatedly indicate that it occurred on October 4, 2008. Tr. 197, 200 and 211. A claim by Napoli under the New Jersey Workers' Compensation Act was settled on June 4, 2010, in favor of Napoli for 135 weeks at $218.69 per week for a total of $29,523.00. Tr. 213-214.

In a "Function Report - Adult" Napoli described her daily routine as follows: driving her daughter to work, doing housework, sometimes shopping, preparing dinner, picking up her daughter from work, eating dinner, cleaning up, relaxing and then going to bed. Tr. 141. Napoli indicated that she had no problem with personal care, except dressing when she is "in a lot of pain." Tr. 142. She also stated that she sometimes walks with a cane. <u>Id.</u> Napoli reported that she needs no special reminders to take care of personal needs and grooming. Tr. 143. Napoli needs no reminders to take her medications. <u>Id.</u> Napoli is able to prepare "complete meals, chicken, salad, veggies, macaroni, etc." which she prepares "everyday." <u>Id.</u> Napoli goes out everyday and is able to drive and ride in a car. Tr. 144. Napoli can drive for up to 1 hour at a time. <u>Id.</u> Napoli watches TV, reads and engages in knitting. Tr. 145. Napoli engages in social activities, including watching her

---

[11]One document seems to indicate that Napoli was injured when she was lifting a wheelchair, in which a patient was sitting, up a flight of stairs. Tr. 184.

friends play softball. <u>Id.</u>  When asked to check items which are affected by her illnesses or conditions Napoli did not check the following: talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. Tr. 146.  Although she stated in the Function Report that she could not lift more than 5 pounds, at the administrative hearing Napoli testified that she could lift up to 10 pounds. Tr. 34 and 146. Napoli further testified that she could do sedentary work so long as she was allowed to get up and walk occasionally and that her doctor advised her to walk. Tr. 34 and 37. Napoli stated that she used a cane but that it was not prescribed by a doctor. Tr. 147. At the administrative hearing she testified that she had not used a cane "for awhile." Tr. 36.

For the reasons set forth below we will affirm the decision of the Commissioner denying Napoli's application for disability insurance benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. <u>See</u> <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record

10

substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

11

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[12] (2) has an impairment that is severe or a combination of impairments that is severe,[13] (3) has an impairment or combination of

---

[12]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

[13]The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work

impairments that meets or equals the requirements of a listed impairment,[14] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[15]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A

---

activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

[14]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[15]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

13

regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Napoli's medical records.

On October 7, 2008, Napoli commenced treatment for back pain with Ronald J. Luszcz, D.O. at Sparta Medical Associates, located in Branchville, New Jersey. Tr. 183-184, 190 and 234.  Dr. Luszcz's treatment notes are mostly illegible but the court can discern that Napoli was treated by him from October 7 through December 30, 2008, and after examining Napoli on multiple occasions he repeatedly released her to engage in light duty work. Tr. 173-186.

Dr. Luszcz ordered x-rays(six views) and an MRI of Napoli's lumbar spine. Tr. 175, 178, 191 and  234.  The x-rays which were performed on October 22, 2008, revealed "[h]ypertrophic degenerative joint disease changes involving the L3-4 vertebral bodies with equivocal narrowing of the disks at these levels" but

no evidence of "compression fracture, dislocation or subluxation."

Tr. 234.  Also, the facets were intact and there was no indication

of destruction of bone."[16] Id. The MRI was performed on November

---

[16]The spine (vertebral column) from the head to the tailbone is
divided into five regions: the cervical (consisting of 7 vertebrae,
C1-C7 in descending order), the thoracic (12 vertebrae, T1-T12 in
descending order), the lumbar (5 vertebrae, L1-L5 in descending
order), the sacrum (5 fused vertebrae, S1-S5 in descending order)
and the coccyx (4 fused vertebrae).

A vertebra consists of several elements, including  the
vertebral body (which is the anterior portion of the vertebra),
pedicles, laminae and the transverse processes.  The vertebral body
is the largest part of the vertebra and is somewhat oval shaped.
The pedicles are two short processes made of bone that protrude
from the back of the vertebral body.  The laminae are two broad
plates extending dorsally and medially from the pedicles and fusing
to complete the vertebral arch (which is the posterior portion of
the vertebra) and encloses the spinal cord.  On an axial view of
the vertebra, the transverse processes are two somewhat wing-like
structures that extend on both sides of the vertebral body from the
point where the laminae join the pedicles. The transverse processes
serve for the attachment of ligaments and muscles. The endplates
are the top and bottom portions of a vertebral body that come in
direct contact with the intervertebral discs.

The intervertebral discs (made of cartilage) are the cushions
(shock absorbers) between the bony vertebral bodies that make up
the spinal column. Each disc is made of a tough outer layer
(annulus fibrosus) and an inner core composed of a gelatin-like
substance (nucleus pulposus).

Degenerative disc disease is the wear and tear and breakdown
of the intervertebral discs as a person grows older.  It is a
process that can result from the dehydration of the discs as well
as an injury to the spine. The breakdown of the intervertebral
discs can result in discs bulging, protruding or herniating as well
as the inner gelatin-like core of the disc extruding outside the
outer layer. These conditions sometimes obstruct the openings
(foramen) along the spine through which nerve roots exit. This
condition is known as neural foraminal narrowing or stenosis. They
can also result in a narrowing of the spinal canal or spinal
stenosis. Such bulges, protrusions and herniations if they contact
nerve tissue can cause pain. Dehydration of the disc can result in
a decrease in the height of the discs.

Degenerative joint disease (or osteoarthritis) is a breakdown
of the cartilage between joints.  In the spine there are facet

15

19, 2008, and revealed "[d]egenerative disc disease with mild bulging discs" and "[m]ild spinal canal stenosis at L3-L4, L4-L5, and L5-S1." Tr. 191.

      Dr. Luszcz prescribed the muscle relaxant Flexeril and the narcotic pain medication Vicodin and referred Napoli to physical therapy three time a week for six weeks at Sussex County Physical Therapy and Rehabilitation. Tr. 173-185 and 187-190. However, the medical records from Sussex County Physical Therapy and Rehabilitation show that Napoli only attended physical therapy on October 20, November 5 and November 10, 2008. Tr. 188.  On December 4, 2008, Dr. Luszcz noted that Napoli had not responded to physical therapy and referred her to a spine surgeon for an evaluation. Tr. 174.  On December 30, 2008, Dr. Luszcz recommended either referral to a back specialist, additional physical therapy or chiropractic treatment. Tr. 172.  Throughout this period of time Dr. Luszcz's diagnostic assessment was that Napoli suffered from spinal stenosis, bulging discs at L3-L4 and L4-L5 and degenerative joint

---

joints which are in the back of the spine and act like hinges. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. These joints are covered with cartilage and the wear and tear of these joint is known as facet arthropathy (arthritis). This wear and tear of the facet joints result in loss of cartilage and can cause pain. Hypertrophy is the enlargement or overgrowth of an organ or part. Subluxation is an incomplete or partial dislocations. See, generally, Spine Anatomy, spineunverse, http://www.spineuniverse.com/anatomy/bone-basics-your-spine (Last accessed June 18, 2014); Dorland's Illustrated Medical Dictionary, 898, 1749 & 1791 (32nd Ed. 2012).

disease (osteoarthritis of the lumbar spine) but even in light of that diagnosis as noted Dr. Luszcz repeatedly released Napoli to perform light duty work. Tr. 177-179, 182, 184 and 186.

On December 15, 2008, Napoli based on the referral from Dr. Luszcz had an appointment with Richard Nachwalter, M.D., at Atlantic Spine Specialists, located in Morristown, New Jersey. Tr. 192-196. At that appointment Napoli complained of back pain but denied any lower extremity complaints. Tr. 192.  The results of a physical examination were essentially normal. Tr. 193.  Dr. Nachwalter observed that Napoli's back was nontender and she was able to stand erect and stand on her heels and toes.[17] Id.  While Napoli claimed that the physical therapy made her worse, Napoli had 5/5 (normal) muscle strength in the lower extremities; her reflexes were normal; she had a negative Babinski sign; she had no clonus;[18] she had pain free range of motion of the hips; and she had negative

---

[17]The heel walk test requires the patient to walk on his heels. The inability to do so suggests L4-5 nerve root irritation. The toe walk test requires the patient to walk on his toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed June 19, 2014).

[18]An abnormal response "called the Babinski's sign, is characterized by an upgoing big toe and fanning outward of the other toes." Plantar Response, Neuroexam.com, http://www.neuroexam.com/neuroexam/content.php?p=32 (Last accessed June 19, 2014). The presence of the Babinski's sign suggests brain or spinal cord injury. Clonus is defined as an abnormal "alternate muscular contraction and relaxation in rapid succession" and "a continuous rhythmic reflex tremor initiated by the spinal cord below an area of spinal cord injury, set in motion by reflex testing." Dorland's Illustrated Medical Dictionary, 373 (32nd  Ed. 2012).

straight leg raising tests.[17] Id. Dr. Nachwalter stated the recent MRI showed "age appropriate" degenerative changes at L3-L4, L4-L5 and L5-S1 but no significant herniations or stenosis. Id. Dr. Nachwalter's diagnostic assessment was that Napoli merely suffered from a lumbar strain. Id. Dr. Nachwalter recommended that Napoli continue her home exercise program and use over-the-counter anti-inflammatory medication. Id. With respect to the "[e]stimated length of disability and work capability," Dr. Nachwalter opined that "Napoli has no objective findings by MRI or physical exam" and there was "no reason she [would] require[] any short term or long term restrictions." Tr. 194.  He released Napoli to work without restrictions. Id.

From January 21 through April 8, 2009, Napoli was examined and treated by Kenneth J. Rieger, M.D., at the New Jersey Spine Center.  Tr. 197 and 200-201.  During that period, Dr. Rieger prescribed Vicodin, the nonsteroidal anti-inflammatory drug Celebrex and physical therapy three times per week for four weeks for Napoli. Id.  At an appointment on January 21st Napoli complained of low back and right buttock pain and that she could

---

[17]The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed June 19, 2014).

not sit or stand for any length of time. Tr. 200.  Napoli, however, denied any leg pain, numbness or weakness, or significant gait changes.  Id.   The results of a physical examination were essentially normal. Id.  Napoli was neurologically intact with 5/5 muscle strength in her lower extremities; she had normal sensation and reflexes in the lower extremities; she had a negative Babinski sign, a negative Faber's test bilaterally,[18] and negative straight leg raising tests bilaterally; and she had minimal tenderness to palpation in her thoracic spine.  Id.   However, her lumbar paraspinal muscles were extremely tender to palpation. Id.  Dr. Rieger's assessment was that Napoli suffered from "some early degenerative changes through her lumbar spine with an exacerbation, which appear[ed] muscular in nature[.]" Tr. 201.  Dr. Rieger had her remain off work and prescribed Celebrex. Id.

The results of a physical examination performed by Dr. Rieger on April 8th remained the same. Tr. 197.  Napoli's muscle strength was intact and she had normal sensation and reflexes in the lower extremities. Id.   Dr. Rieger prescribed Vicodin and recommended physical therapy. Tr. 197 and 199.  Dr. Rieger did not provide an assessment of Napoli's ability to engage in her previous

---

[18]The Patrick's (Faber) test is "[a] test to determine the presence or absence of sacroiliac disease; with patient supine, the hip and knee are flexed and the external malleolus is placed above the patella of the opposite leg; this can ordinarily be done without pain, but, on depressing the knee pain is promptly elicited in sacroiliac disease."  Medical Definition of Patrick's Test, Lexic.us, http://www.lexic.us/definition-of/Patrick's_test (Last accessed June 19, 2014).

skilled, medium work. Id.

On two occasions Napoli was evaluated in connection with her Worker's Compensation claim by Arthur H. Tiger, M.D., at the request of Napoli's attorney. Tr. 209-212. The first evaluation occurred on June 12, 2009, and the second evaluation on November 13, 2009. Dr. Tiger's examination findings and assessments were similar on both occasions. Id. Dr. Tiger found that Napoli had profound loss of the usual lumbar lordotic curvature; she had spasm in the paraspinal muscles of the lower lumbar region; she had multiple areas of hard fibrotic muscles on both sides of the lower lumbar spine, more so on the right than the left;[19] she had tenderness to palpation over the L2, L3, L4 and L5 vertebral spinous processes; she had radiation of pain into the right buttock and right lower extremity when pressure was applied over the right sacroiliac joint; she had limited lumbar range of motion; she had a positive straight leg raising test on the right; and she had weakness of the right Achilles reflex as compared to the left. Tr. 209. Dr. Tiger indicated that with respect to Napoli's New Jersey Worker's Compensation claim that Napoli was unable to work since

[19]Fibrosis, a noun, is the formation of excessive fibrous tissue, as in a reparative or reactive process. Fibrotic is the adjective. It is not clear what is being described here. It could be that Dr. Tiger is indicating muscular fibrosis, a condition where there is excessive formation of fibrous bands of scar tissue formed between muscle fibers or merely that Napoli had stiff lower back muscles on each side of the spine without concluding that Napoli actually suffered from fibrosis.

October 4, 2008, because of "evidence of spinal stenosis, multiple bulging discs causing a clinical right-sided lumbar radiculopathy, as well as a chronic lumbosacral strain syndrome with chronic myofascitis [muscle inflammation]." Tr. 212. Dr. Tiger noted that Napoli had a "partial total" disability of 80% under the New Jersey Worker's Compensation law and that both of his reports were only to be used in connection with determining Napoli's "worker's compensation disability." Id. Dr. Tiger did not opine that Napoli was totally disabled for purposes of Social Security disability insurance benefits. Id.

Napoli was also examined on two occasions by Arthur Canario, M.D., an orthopaedic surgeon, in connection with her Worker's Compensation claim. Tr 215-219.

On July 29, 2009 Dr. Canario found that, while Napoli did complain of back pain at maximum flexion, she had full range of motion of her lumbosacral spine with flexing to 70 degrees and extension to 30 degrees; she had full lateral bending and rotation at 35 degrees; her straight-leg raising test produced pain at 90 degrees; double thigh flexion improved her symptoms at 120 degrees; and she had paravertebral tenderness without sciatic notch tenderness. Tr. 219. Dr. Canario stated that Napoli's MRI revealed no acute or significant findings and that the degenerative changes were not caused by her work accident in October, 2008. Id. Dr. Canario further stated that Napoli's symptoms actually increase

21

with inactivity, but improved with activity. Tr. 218.  Napoli was observed to walk with a normal gait and she did not need a back support or cane. Tr. 219. Dr. Canario agreed with Dr. Nachwalter's opinion that Napoli only had a back strain, and he also found that she was "certainly employable." Id.  Similar findings and assessment were made by Dr. Canario at an examination of Napoli on August 31, 2010. Tr. 215-217. Dr. Canario stated that Napoli "is capable of employment in her current state." Tr. 217.

Napoli was treated by Michael Rudman, M.D., at Morristown Memorial Hospital, Pain Management Center, from October 8, 2010, through May 20, 2011. Tr. 221-233.  On October 8, 2010, Dr. Rudman noted that Napoli's gait was upright and antalgic, but she did not require a cane or crutch. Tr. 232.  Napoli could easily rise from a seated position to a standing position, and she had no gross motor or sensory deficits in her lower extremities.  Dr. Rudman recommended a series of three epidural steroid injections, which were administered on October 8, November 1 and December 3, 2010. Tr. 227-229 and 233.  Napoli tolerated all of the injections "extremely well." Tr. 223, 228 and 230.  On January 21, 2011, Dr. Rudman examined Napoli and reported that Napoli was able to get up relatively easy from a seated to a standing position; she had no significant spinous process or paravertebral tenderness; she had no gross motor or sensory deficits in the lower extremities; and straight leg raising tests caused some mild right posterior thigh

pain. Tr. 226.  Similar findings were recorded by Dr. Rudman at an appointment on March 21, 2011. Tr. 224.  Finally, on May 20, 2011, Dr. Rudman noted that Napoli was able to get up easily from a seated to a standing position; Napoli's lumbar range of motion was 60 degrees flexion and 20 degrees extension; her straight leg raising test caused right low back pain at 70 to 80 degrees; and she had no gross motor or sensory deficits in the lower extremities. Tr. 222.  Napoli was prescribed Advil and Percocet and Dr. Rudman recommended physical therapy. Id.

On November 23, 2010, Napoli was examined by Barry Kurtzer, M.D., on behalf of the Bureau of Disability Determination. Tr. 159-161.  After performing a clinical interview and physical examination, Dr. Kurtzer concluded that Napoli had "a history of bulging disc, status post epidural and physical therapy still with pain in her right leg and mildly decreased motor strength." Tr. 161.  The results of the physical examination were essentially normal, including it was observed that Napoli had full range of motion in her upper and lower extremities, a stable gait and that she ambulated without difficulty. Tr. 160-161.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Napoli had not engaged in substantial gainful work activity since November 21, 2008, the alleged onset date set forth by Napoli in her application. Tr. 12.

23

At step two of the sequential evaluation process, the administrative law judge found that Napoli had the following severe impairments: "Disorder of the lumbar spine." Id. Napoli has not challenged the administrative law judge's step 2 analysis.

At step three of the sequential evaluation process the administrative law judge found that Napoli's impairments did not individually or in combination meet or equal a listed impairment. Id. Napoli has not challenged the administrative law judge's step three analysis.

At step four of the sequential evaluation process the administrative law judge found that Napoli had the residual functional capacity to perform a limited range of sedentary work. Tr. 13. Specifically, the administrative law judge found that Napoli had the

> capacity to lift or carry no more than 10 pounds occasionally and less than 10 pounds frequently, stand or walk for 4 hours out of an 8 hour work day, and sit for 4-6 hours out of an 8 hour work day with the opportunity to sit/stand or change positions hourly. The claimant's ability to push and pull is unlimited at the aforementioned weights. The claimant can occasionally climb ramps and stairs but never ladders, ropes or scaffolds, and she can occasionally balance, stoop, kneel, crouch or crawl. The claimant must avoid moderate exposure to vibration. The claimant must avoid work around hazards, such as work around dangerous machinery, or work at heights.

Id. In setting the residual functional capacity, the administrative law judge reviewed the medical records and considered several other items including the treating physicians'

24

medical notes and the report from the consultative examiner, Dr. Kurtzer. Tr. 13-15. The administrative law judge found that Napoli's statements about her functional limitations were not credible to the extent they were inconsistent with the above residual functional capacity. Tr. 15. The administrative law judge relied on the notes and opinions of treating physicians who either indicated that Napoli could engage in light duty work or was unrestricted in her work capabilities, including Dr. Nachwalter, who opined that Napoli had no need for short or long-term work restrictions, but the ALJ gave Napoli the benefit of the doubt and reduced her capacity to the sedentary work level. Tr. 13-15. The treating physicians' medical notes and opinions and the opinion of the consultative examiner, Dr. Kurtzer, were supportive of the residual functional capacity set by the administrative law judge. The administrative law judge did not have to accept the findings or opinions of the non-treating physicians who examined Napoli only in connection with her Worker's Compensation claim.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found at step four that Napoli could not perform her prior relevant work as an automobile salesperson, real estate agent and mental health aide but that she could perform her prior skilled, sedentary work as a newspaper district manager. Tr. 15. Consequently, the administrative law judge found that Napoli was not disabled and she

did not proceed to step five of the sequential evaluation process. Tr. 15-16.

The administrative record in this case is 251 pages in length, primarily consisting of medical and vocational records. The administrative law judge did an adequate job of reviewing Napoli's medical history and vocational background in her decision. Tr. 10-16. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 13, Brief of Defendant.

Napoli argues that the administrative law judge erred by (1) failing to develop a full and complete administrative record and to assure that Napoli appropriately waived her right to counsel; (2) failing to provide a proper hypothetical to the vocational expert;(3) making statements in her decision which were misleading and contrary to the evidence; and (4) inappropriately assessing Napoli's credibility.

Napoli's initial argument is devoid of any merit whatsoever. Napoli was sent at least three written notices outlining in detail her right to be represented by counsel at the administrative hearing and the ALJ at the hearing adequately questioned Napoli regarding whether or not she wanted to obtain counsel or proceed with the hearing without counsel.  Napoli advised that she received the written notices and that she wanted to proceed without counsel.  It is correct that an administrative

law judge has an affirmative obligation to develop the record. Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]").  If the record is not adequately developed, remand for further proceedings is appropriate. Id.  In this case, however, we are satisfied that the administrative law judge complied with her affirmative obligation to develop the record. The ALJ took appropriate steps after the hearing to fully develop the record and Napoli has not proffered any additional medical evidence which relates to the relevant time period, i.e. from the her alleged disability onset date to the date last insured.

Second, the ALJ appropriately questioned the vocational expert.  While it is true that many of Napoli's medical records were missing when the ALJ posed the hypothetical questions to the vocational expert, the ALJ still had the report from the consultative examiner, Dr. Kurtzer, as well as Napoli's testimony. The ALJ's hypothetical asked the vocational expert to consider someone who could lift no more than 10 pounds, which was consistent with Napoli's own assessment of her abilities and the consultative examiner's opinion. The ALJ also asked the vocational expert to

27

consider an individual who needed to alternate between sitting and standing, which also was consistent with Napoli's own assessment of her abilities. Most importantly, the ALJ under the social security regulations is only required to include in a hypothetical question credibly established limitations. <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005); <u>Plummer v. Apfel</u>, 186 F.3d 422, 431 (3d Cir. 1999). The record contains an opinion from a treating physician indicating that Napoli was capable of performing light duty work as well as an opinion from a treating physician stating that Napoli had no work restrictions. The ALJ set forth in the hypothetical questions all of Napoli's credibly established limitations and in fact gave Napoli the benefit of the doubt.

Third, the court discerns no misleading statements in the ALJ's decision relating to opinions regarding whether or not Napoli was disabled. The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c).

No treating or examining physician has indicated that Napoli suffered from physical functional limitations that would preclude her from engaging in the limited range of work set by the

28

administrative law judge in her decision for the requisite statutory 12 month period.[20] No physician indicated that Napoli was incapable of engaging in the limited range of work set by the administrative law judge on a full-time basis.

The record does not reveal any reason why the administrative law judge could not rely on the opinion of the treating physician who opined that Napoli could engage in light duty work. A treating physician has not provided a statement indicating that Napoli had physical limitations that would preclude her from engaging in work as a newspaper district manager, and the bare medical records do not provide support for such a conclusion. The ALJ did not have to except the opinion of Dr. Tiger, a non-treating physician, who rendered his opinion solely in connection with the Worker's Compensation proceeding and who did not provide a detailed work-related functional capacity assessment indicating that Napoli was incapable of performing the exertional and nonexertional requirements of sedentary work for the requisite continuous 12-month period.[21]

---

[20]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

[21]To the extent that the ALJ did not comment in her decision on Dr. Tiger's examination notes we consider that omission harmless error under the totality of the evidence. See Weary v. Astrue, Civil No. 10-896, slip op. at 40-41 (M.D.Pa. Dec. 15, 2010)(Muir,

Finally, with respect to Napoli's argument that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Napoli's claims regarding her physical limitations. <u>See</u> <u>Van Horn v. Schweiker</u>, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." <u>Walters v. Commissioner of Social Sec.</u>, 127 f.3d 525, 531 (6th Cir. 1997); <u>see</u> <u>also</u> <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Napoli testify, the administrative law judge is the one best suited to assess her credibility.

We are satisfied that the administrative law judge appropriately took into account all of Napoli's limitations in the residual functional capacity assessment. Our review of the

J.)(applying harmless error analysis); <u>Boyd v. Astrue</u>, Civil No. 11-600, slip op. at 25-26 & 28 (M.D. Pa. May 10, 2012)(Munley, J.).

30

administrative record reveals that the decision of the Commissioner
is supported by substantial evidence.  We will, therefore, pursuant
to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

        An appropriate order will be entered.